## THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 25-00001 |
| Plaintiff, | |
| vs. | **DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, ECF NO. 46** |
| JESUS K. PAULINO, JR., | |
| Defendant. | |

Defendant Jesus K. Paulino, Jr., moves this court for an order suppressing all evidence and "fruit" obtained as a result of the search in Defendant's residence. Specifically, Defendant wishes to suppress evidence obtained at his residence, 145 Antonia Court, Unit 2, Tamuning, Guam;[1] from his vehicle, a Toyota 4-Runner, license plate SJ 4009;[2] and from his electronics: an iPhone, a laptop, and a thumb drive. The Motion to Suppress came before this court for an evidentiary hearing on September 29, 2025. After hearing the testimony of witnesses and arguments from counsel, the court took the motion under advisement. For the reasons herein, the motion to suppress is **DENIED**.

---

[1] 1 Apple MacBook laptop; 2 digital scales; 1 passport with boarding passes; 1 metal binder with miscellaneous documents; 1 Abellera parcel with contents; 1 Apple iPhone, blue; and 1 Sandisk thumb drive. *See* GE 4-14.
[2] 1 plastic container with 2 Ziplock baggies. *See id.*

**I. FACTS**

The Government called three witnesses: (1) U.S. Postal Inspection Service Task Force Officer Jonathan Greg M. Calvo; (2) former U.S. Postal Inspection Service Task Force Officer Valerie Pereda;[3] and (3) Special Agent Erfel Matanguihan from Homeland Security Investigations ("HSI"). Defendant did not call any witnesses.

Based on the testimony presented at the evidentiary hearing and the admitted evidence, the court makes the following factual findings.

Officer Calvo testified that a package addressed to an individual with the name of Arshalisha Abellera was flagged as suspicious on February 18, 2025. The package was from California, a "source state"; there was a discrepancy in the PMB address; and it was sent via Priority Mail.[4] Further, Airport Police Drug Detection Dog "Tara", whose positive alerts are at approximately 92%, alerted the presence of narcotics on the package. *See* GE 1-7 at ¶ 10. Based on this, the court found probable cause to issue a search warrant on the package on February 19, 2025. *See* MJ 25-00019, Gov't Ex. 1.

The package was opened pursuant to the search warrant. The package contained approximately 14,533 grams of methamphetamine. Officer Pereda testified that the methamphetamine was found in two boxes contained within the package and they were hidden in inflatable mattresses. On February 21, 2025, the court found probable cause to issue a tracking warrant. *See* MJ 25-00020, Gov't Ex. 2. Officer Calvo testified that the methamphetamine was replaced with "sham" and two tracking devices were installed in the package, one being a GPS device to provide location of the package and the other being a breach device to notify law enforcement officers if the package was opened. Officer Pereda testified that she also applied

---

[3] Ms. Pereda was a Task Force Officer at the time this case was being investigated. *See* Gov't Ex. 2, 3, 4, and 5.
[4] It is common for packages containing illegal narcotics to be sent via Priority Mail because "the substances or proceeds arrive faster and on a predictable date, thereby allowing the senders to keep track of the shipment[.]" GE 1-3 at ¶ 7a.

1    clue spray inside the package, in addition to installing the tracking devices. She then re-taped the

2    package and tried to keep it as identical as possible as the original packaging. Officer Calvo

3    testified that he, along with Officer Pereda, delivered the package that now contains the sham,

4    along with the tracking devices (hereinafter "Abellera package"), to a MailHub[5] for a controlled

5    delivery.

6        On February 26, 2025, law enforcement officers conducted a surveillance at the

7    MailHub, and Officer Calvo observed a white Toyota 4-Runner driven by Defendant Paulino and

8    a female passenger later identified as Archanceo. Both Defendant and the passenger went inside

9    the MailHub and when they came out, Defendant was seen carrying the Abellera package and

10    placing the package in the trunk of the Toyota 4-Runner. Defendant, along with his passenger,

11    drove away from the MailHub, and law enforcement officers followed the Toyota 4-Runner.

12    Officer Calvo testified that he believed Defendant conducted a countersurveillance, that is, when

13    one checks if they are being followed. This was based on the fact that after the Toyota 4-Runner,

14    driven by Defendant, left the MailHub, it stopped at a pavilion near the Alupang Beach Tower,

15    along Route 1. It parked there for approximately 3-5 minutes. Thereafter, the Toyota 4-Runner

16    headed to several locations: first, at the University of Guam, dropping off Passenger Archanceo

17    at the university; second, at Onigiri Seven's drive-thru, a Tamuning restaurant; third, at an

18    apartment across from Denny's restaurant in Tamuning[6] wherein Defendant hung out for

19    approximately 1.75 to 2 hours; fourth, at another apartment complex, which was later discovered

20    to be Defendant's residence, 145 Antonia Court in Tamuning, wherein he hung out for a "couple

21    of hours"; and fifth, at Don Don Donki, a Japanese store chain, where Defendant stayed for

22    approximately an hour, before returning to 145 Antonia Court. Throughout this time, the

23

24

---

[5] Officer Calvo described MailHub as a third-party contractor for the post office. In other words, it acts like a post office, but it is operated by a third-party.

[6] Officer Calvo was unsure of the name of the apartments, referring to it as either Summer Green or Summer Breeze.

Abellera package remained in the Toyota 4-Runner.

On February 27, 2025, at approximately midnight, the officers' surveillance observed that the Toyota 4-Runner left the 145 Antonia Court location. The Toyota 4-Runner was being driven erratically, going over the speed limit and then suddenly slowing down, and making sudden turns. Officer Calvo testified that he believed Defendant was conducting a "heat run," another form of countersurveillance to see if he was being followed. The Toyota 4-Runner made a stop in Tamuning and drove through Tumon, before returning to 145 Antonia Court, Tamuning, for several hours.

At approximately 6:00 a.m., that same day, law enforcement officers detected movement of the package and the officers' surveillance revealed that the Toyota 4-Runner headed to Wendy's in Tamuning. The Toyota 4-Runner then returned to 145 Antonia Court, with no activity throughout the morning and most of the afternoon.

At approximately between 4:20 p.m. to 4:30 p.m., that same day, law enforcement officers received a motion signal and later a breach signal from the tracking devices installed in the Abellera package. Officer Pereda testified that approximately six minutes elapsed between the signal that the package was being moved and the breach signal that the package was opened. Law enforcement officers converged at the road leading to 145 Antonia Court. That address has a two-story structure with multiple units. Law enforcement officers did not know which unit the Abellera package had gone into, nor did they know which unit Defendant, the driver of the Toyota 4-Runner, had entered. Officer Pereda knocked on the first unit and asked where the owner of the white Toyota 4-Runner resided. The residents of the first unit directed Officer Pereda to the unit next to them, Unit 2. Testimony from the officers revealed that none of them knew what to expect from Unit 2. They did not know who resided in that unit or how many people were there. Special Agent Matanguihan testified that they thought Defendant, the driver

of the Toyota 4-Runner, resided in Yigo or Upper Tumon.

Law enforcement officers knocked on the door of Unit 2. An individual by the name of Tobias Lyons opened the inner door,[7] and law enforcement officers observed that Mr. Lyons had soapy hands and face, which concerned the officers that he could possibly have been washing off the clue spray from the Abellera package, thereby destroying evidence. Mr. Lyons indicated to the officers that another occupant of the unit was with him, his roommate, Defendant Paulino. Law enforcement officers entered the residence and conducted a "protective sweep."[8] Officers Calvo and Pereda described this process as (1) ensuring that evidence is not destroyed and the suspects do not flee, and (2) ensuring the safety of the officers. The officers also wanted to make sure that their tracking devices were not destroyed.

When the officers entered the residence, that was when Officers Calvo and Pereda saw Defendant coming out of a room, which was later discovered to be Defendant's bedroom. Defendant was detained, along with Mr. Lyons. They were handcuffed and at some point, they were taken outside of the residence. Law enforcement officers conducted the protective sweep, and they did not find any other individuals in the residence. Officer Pereda observed the Abellera package and its contents on the floor in Defendant's bedroom. After the sweep, everyone exited the residence.

The protective sweep was necessary. Officer Calvo testified that from his experience, there are many scenarios when evidence can easily be destroyed. These include flushing the evidence down the toilet, burning or throwing them into the jungle, or when they're loaded onto

---

[7] The unit was described to have an outer screen door.

[8] In an HSI report prepared by Special Agent Matanguihan, he referred to a "cursory search." Special Agent Matanguihan explained at the evidentiary hearing what this terminology means. "Cursory search" is similar to a protective sweep. The main goal is to look for threats – whether it be individuals who can harm law enforcement officers, or items such as firearms or bombs that pose danger to the law enforcement officers. Special Agent Mantagiuhan testified that no search was conducted at the residence until after the search warrant was obtained. The court notes, however, that Special Agent Matanguihan did not enter the residence at the same time as Officers Calvo and Pereda and others. He testified that he was initially in the back of the structure performing perimeter protection.

1 another vehicle, among other things. Officer Pereda expressed the same concerns, including

2 suspects possibly fleeing, and the tracking devices being destroyed.

3       There were also safety concerns. Officers know that drugs typically involve firearms. In

4 addition, Officers Calvo and Pereda testified that they know Defendant to have law enforcement

5 background. Officer Calvo testified that he and Defendant were "cycle mates" when they

6 attended the Guam Customs and Quarantine Criminal Justice Academy. Their training included

7 use of firearms, defensive tactics, among other things. Officer Pereda testified that Defendant

8 was a former Guam Customs and Quarantine officer, having worked the midnight shifts with

9 him. As a Guam Customs and Quarantine officer, Officer Pereda testified that they must

10 periodically pass a qualifying firearms test.

11       Officers Calvo and Pereda testified that none of the law enforcement officers searched,

12 touched, moved, or removed anything from the residence during the protective sweep and prior

13 to a search warrant. Sometime after or during the protective sweep,[9] Officer Pereda soon exited

14 the residence and started working on the search warrant for the residence and the Toyota 4-

15 Runner. The U.S. Attorney's Office emailed a copy of the search warrant for chambers' review

16 at 7:31 p.m.,[10] approximately three hours after the tracking device emitted a breach signal. The

17 court, finding probable cause, issued a search warrant for the residence and the Toyota 4-Runner

18 at 8:22 p.m., on February 27, 2025. *See* MJ 25-00026, Gov't Ex. 4.

19       After the search warrant was executed on the residence and the Toyota 4-Runner, items

20 were seized. *See* GE 4-14. Finding probable cause, the court subsequently issued a search

21 warrant on the electronic items found in the residence. These items were a blue iPhone

22 cellphone, an Apple MacBook Pro laptop, SRN: C02V88F3HTD5, and a black Sandisk Thumb

23

24 [9] The timing was unclear from the record.
[10] This information was obtained from the court's own email records.

1 | drive. *See* MJ 25-00031, Gov't Ex. 5.

2 | **II. DISCUSSION**

3 | On a motion to suppress, the controlling burden of proof imposes no greater burden than

4 | proof by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14

5 | (1974). Moreover, the prosecution, as the proponent of the evidence, must bear the burden of

6 | proving its admissibility. *Katz v. United States*, 389 U.S. 347 (1967). Lastly, the government also

7 | bears the burden to show by a preponderance of the evidence whether an exception applies.

8 | *United States v. Taylor*, 634 F.Supp. 3d 690, 695 (N.D. Cal. Oct. 4, 2022).

9 | **A. There was no warrantless search and seizure of the residence.**

10 | Defendant argues that a warrantless entry and search occurred when the officers entered

11 | the residence. *See* Mot. at 4, ECF No. 46. However, based on the court's factual findings, the

12 | warrantless entry does not rise to the level of any Fourth Amendment violations. The Supreme

13 | Court has held that "securing a dwelling, on the basis of probable cause, to prevent the

14 | destruction or removal of evidence while a search warrant is being sought is not itself an

15 | unreasonable seizure of either the dwelling or its contents." *Segura v. United States*, 468 U.S.

16 | 796, 810 (1984). In that case, the officers secured the defendant's apartment, and two officers

17 | remained in the apartment for approximately 19 hours until a search warrant was issued.

18 | In this case, the Government has met its burden by a preponderance of the evidence that

19 | there was probable cause to secure the residence while a search warrant was sought.

20 | First, the Government established that the package at issue contained over 14,533 grams

21 | of methamphetamine. That package was then placed in the trunk and stayed in the trunk of the

22 | white Toyota 4-Runner that was driven by Defendant from the time the package left the MailHub

23 | to Defendant's residence, and other places in between.

24 | Second, the officers were alerted that the package was being moved and soon after that

alert, the breach signal was emitted. This means that the package was opened. The officers had to act quickly to ensure that that the evidence was not destroyed. From when the officers knocked on the door of Unit 2 and it was opened by Mr. Lyons, the officers were already concerned that evidence was being destroyed. Mr. Lyons appeared at the front door with soapy face and hands, possibly in an attempt to wash off the clue spray chemicals from the package. From the officers' experience, evidence can quickly be destroyed. Evidence can be flushed down the toilet, burned or thrown in the jungle, among other things. The officers were also unaware whether there was a back door of the unit that would allow the suspect or suspects to flee or the evidence to leave.

Third, the officers immediately noticed Defendant exiting from a bedroom. The officers are aware that Defendant has law enforcement training and background, and firearms and drugs typically go hand in hand. If the officers did not act to secure the residence, they may be endangering themselves.

Finally, the testimony from all three witnesses was consistent in that no search was conducted prior to the issuance of the search warrant of the residence. Officers Calvo and Pereda testified that none of the law enforcement officers searched, touched, moved, or removed anything from the residence during the protective sweep and prior to a search warrant. Both officers entered the residence at the very beginning from when they knocked on the door and participated in the protective sweep. Although an HSI report made a reference to a "cursory search" having been conducted, Special Agent Matanguihan testified that a cursory search is similar to a protective sweep, with the main goal of ensuring that there is no threat to the law enforcement officers. Special Agent Matanguihan also testified that there was no search performed in the residence, although the court notes that the agent can only testify to what he observed after he performed his perimeter protection at the rear of the multi-unit structure.

The court finds that the law enforcement officers did not waste time in seeking a search

warrant soon after they conducted the protective sweep. First, Officer Pereda testified that there was simply no time to request for a search warrant from the time they detected a movement to the time a breach signal was emitted. These two events happened so quickly, about six minutes apart. Second, soon after the protective sweep was performed, Officer Pereda started working on the application for a search warrant. The application was sent to the court approximately three hours from the time the movement signal was emitted.

Based on the facts of this case, the court finds that there was probable cause for the officers to secure the residence while a search warrant was being sought, to ensure that evidence was not destroyed and to ensure the safety of the officers. The court further finds that there was no unreasonable search and seizure of Defendant's residence or its contents in violation of the Fourth Amendment pursuant to *Segura*.

### B. Assuming arguendo that there was a warrantless search and seizure of the residence, exigent circumstances exist.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

"The Fourth Amendment proscribes unreasonable searches. As a general rule, searches conducted without a warrant and probable cause are presumptively unreasonable, subject to a number of 'specifically established and well-delineated exceptions.'" *United States v. Rambo*, 74 F.3d 948, 953 (9th Cir. 1996), citing to *Katz*, 389 U.S. at 357. *See also Collins v. Virginia*, 584 U.S. 586, 593 (2018) (warrantless entries into homes are presumptively unreasonable unless justified by exigent circumstances). One exigent circumstance is when a law enforcement officer

1   makes a warrantless entry to "prevent the imminent destruction of evidence" or to "prevent a

2   suspect's escape." *Brigham City v. Stuart*, 547 U.S. 398, 403 (1990). Exigent-circumstances

3   exceptions are reviewed on a case-by-case basis, with the court examining whether an

4   emergency justified a warrantless search in each case. *Lange v. California*, 594 U.S. 295, 302.

5   (2021).

6       "Even when exigent circumstances exist, police officers must have probable cause to

7   support a warrantless entry into a home. Probable cause requires only a fair probability or

8   substantial chance of criminal activity, and we determine the existence of probable cause by

9   looking at the totality of the circumstances known to the officers at the time." *United States v.*

10  *Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002) (citation and quotation omitted).

11      Assuming arguendo that Defendant's assertions are true, that a warrantless search

12  occurred *prior* to the issuance of a search warrant for the residence, the court finds that exigent

13  circumstances exist for the same reasons stated above. There was probable cause of a criminal

14  activity in the residence because the officers received a notification from their tracking devices

15  that the package was opened. Whoever opened the package would have seen the tracking devices

16  and based on the officers' experience, evidence can be quickly and easily destroyed. Specifically,

17  officers testified that drugs (or in this case, the sham) can easily be flushed down the toilet. The

18  officers were acting quickly to prevent the imminent destruction of the evidence.

19      Further, based on the officers' knowledge that Defendant has a law enforcement

20  background, including the use of firearms and defensive tactics, along with the officers' lack of

21  knowledge of whether there was a back door to escape to and the unknown factors of how many

22  individuals were in the residence, the officers had to act quickly to prevent a suspect's or

23  suspects' escape.

24      **C.  There was no probable cause for the law enforcement officers to seek an**

**anticipatory search warrant on 145 Antonia Court, Tamuning, Guam.**

Defendant attempts to argue that the warrantless search and/or entry was not justified because the law enforcement officers could have sought an anticipatory search warrant on the residence, similar to how they sought an anticipatory search warrant on 210 Tun Luis Takano Subd, Yigo, Guam. *See* MJ 25-00021, Gov't Ex. 3.

The court finds that had there been an application for an anticipatory search warrant for 145 Antonia Court, Tamuning, Guam, the court would have denied such application for lack of probable cause. The package was not addressed to that residence, and it was not tied to the mailbox rental owner at the MailHub. The package was not taken out of the Toyota 4-Runner and into the residence until February 27, 2025, at approximately between 4:20 p.m. and 4:30 p.m., when the officers entered the unit. The officers had no prior knowledge of which unit was occupied by Defendant. The officers had to find out by inquiring from the residents of Unit 1. In fact, the officers were not aware Defendant resided at 145 Antonia Court, Tamuning, since their information made them believe Defendant resided either in Yigo or Upper Tumon. There would not have been probable cause to grant an anticipatory search warrant on all the units contained in that multi-unit structure.[11]

### III. CONCLUSION

Based on the discussion above, the court hereby **DENIES** Defendant's Motion to Suppress Evidence. The court will issue a separate trial scheduling order to set this matter for trial.

**SO ORDERED.**



*/s/* **Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Oct 03, 2025**

---

[11] Officer Calvo testified that he believes there was 5 or 6 units in the two-story structure.